| | | |
|---|---|---|
| **JUMPSPORT, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ACADEMY, LTD d/b/a ACADEMY** | § | **CASE NO. 6:17-cv-414-RWS-JDL** |
| **SPORTS & OUTDOORS;** | § | **(LEAD CONSOLIDATED CASE)** |
| | § | |
| **WAL-MART STORES, INC., et al.;** | § | **CASE NO. 6:17-cv-645-RWS-JDL** |
| | § | |
| **DICK'S SPORTING GOODS, INC.,** | § | **CASE NO. 6:17-cv-663-RWS-JDL** |
| **et al.; and** | § | |
| | § | |
| **AMAZON.COM, INC., et al.,** | § | **CASE NO. 6:17-cv-666-RWS-JDL** |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos. 6,053,845 ("the '845 Patent") and 6,261,207 ("the '207 Patent"). Plaintiff JumpSport, Inc. ("JumpSport" or "Plaintiff") alleges Defendants Academy, Ltd., d/b/a Academy Sports + Outdoors; Amazon.com, Inc.; Amazon.com LLC; Dick's Sporting Goods, Inc.; American Sports Licensing, LLC, f/k/a American Sports Licensing, Inc.; Dick's Merchandising & Supply Chain, Inc.; Wal-Mart Stores, Inc.[1]; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wal-Mart.com USA, LLC; Sam's East, Inc.; and Sam's West, Inc. (collectively referred to as "Defendants") infringe the '845 and '207 Patents. Plaintiff filed an opening claim construction brief (Doc. No. 138), to which Defendants filed a responsive brief (Doc. No. 146), and Plaintiff filed a reply (Doc. No. 155). The Parties additionally submitted a Joint Claim Construction Chart pursuant to P.R. 4-5(d). (Doc. No. 157.) On August 16, 2018, the Court held a claim construction

---

[1] On February 01, 2018, Wal-Mart Stores, Inc. was renamed Walmart Inc.

hearing. Upon consideration of the Parties' arguments, and for the reasons stated herein, the Court adopts the constructions set forth below.

## OVERVIEW OF THE PATENTS

Plaintiff claims that Defendants, various retailers, sell trampolines that directly infringe or induce infringement by consumers of claims 1, 2, 3, 5, 7, 8, 12, 13, 15, and 17 of the '845 Patent and claims 9, 12, 17, 25, 26, 27, 30, 31, 33, and 34 of the '207 Patent. The '207 Patent is a continuation of the '845 Patent and they share substantially the same specification. Both Patents are entitled "Trampoline or the Like with Enclosure." The disclosure of both Patents is generally directed to the wall structure of a trampoline enclosure. '845 Patent at 1:14–20. More specifically, the Patents are directed toward a safety fence connected to resilient, rather than rigid, poles designed to absorb the energy of a jumper's impact and propel the jumper back toward the center of the trampoline. '845 Patent at 1:48–59. These concepts are reflected in the Patents' asserted claims, and independent claim 1 of the '845 Patent is set forth below for reference:

> 1. A trampoline having a safety enclosure therearound, comprising:
>     a frame;
>     a rebounding mat coupled to the frame by plural spring members;
>     plural independent poles, each extending above the rebounding mat;
>     the safety enclosure comprising a flexible material coupled to said independent poles and to the rebounding mat;
>     wherein the coupling of the safety enclosure to both the independent poles and to the rebounding mat helps in absorption of impact forces to the safety enclosure.

'845 Patent at 20:27–40.

There are six disputed terms or phrases in the asserted claims.

## LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or

disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the

patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

In patent construction, "subsidiary fact finding is sometimes necessary" and the court "may have to make 'credibility judgments' about witnesses." *Teva v. Sandoz*, 135 S. Ct. 831, 838 (2015). In some cases, "the district court will need to look beyond the patent's intrinsic evidence

and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Id.* at 841. "If a district court resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention, the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term *in the context of the specific patent claim under review*." *Id.* (emphasis in original). When the court makes subsidiary factual findings about the extrinsic evidence in consideration of the "evidentiary underpinnings" of claim construction, those findings are reviewed for clear error on appeal. *Id.*

## DISCUSSION

### I.    AGREED CLAIM TERM CONSTRUCTIONS

The Parties submitted the following terms for which they agreed on constructions:

| Term/Phrase | Agreed Construction |
|---|---|
| **"extends between upper end portions of adjacent poles"**<br><br>'845 Claim 1 | "Goes between nearby poles near the tops of the poles, whether or not directly attached to the poles." |
| **"resilient sheaths"**<br><br>'845 Claims 12, 13, 15<br><br>'207 Claims 25, 26, 27, 33, 34 | "Energy-absorbing covers (*e.g.*, foam), on the poles." |
| **"plural independent poles"**[2]<br><br>'845 Claim 1 | "More than one structurally supportive pole that is elongated (or pieces of the same that connect together to form one pole) wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner." |

(Doc. No. 157.)

---

[2] While the Parties originally disputed the construction of "plural independent poles" in their Joint Claim Construction Chart, at the beginning of the claim construction hearing the Parties announced they had agreed to the above construction.

After reviewing the Parties' agreed constructions in light of the asserted claims, specification, and prosecution history, the Court finds the Parties' agreed constructions appropriate and construes the terms as set forth above.

Furthermore, at the beginning of the claim construction hearing, the Parties announced their agreement that no construction was necessary for the term "couple." The Court finds the plain and ordinary meaning of the term "couple" sufficiently describes the scope and meaning of its usage in the Patents. As a dispute regarding the meaning and scope of the term is no longer before this Court, the Court declines to construe the term "couple." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

## II.     DISPUTED CLAIM TERMS

The Parties dispute the meaning of the following claim terms, which are set forth herein:

### A.  "plurality of posts" / "plural support members" ('207 Patent, Claims 9, 12, 14)

| Plaintiff's Proposal[3] | Defendants' Proposal |
|---|---|
| "More than one structurally supportive pole that is elongated (or pieces of the same that connect together to form one pole) wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner." | "More than one structurally supportive pole that is elongated (or pieces of the same that connect together to form one pole)." |

Defendants argue that due to the omission of the term "independent" in the claim terms "plurality of posts" and "plural support members," the Court should omit the language "wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner" from its claim construction. (Doc. No. 146, at 13–14.) Defendants argue that

---

[3] At the claim construction hearing the Parties amended their prior positions indicated in the Joint Claim Construction Chart and narrowed their dispute only to the issue of whether the clause "wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner" should be included in the construction.

the patentee's decision to omit "independent" from the claim language should be afforded weight by the Court. (Doc. No. 146, at 13–14.) Plaintiff argues that the Patents are directed toward independent poles and explicitly teach away from non-independent posts as being "non-advantageous." (Doc. No. 155, at 3 (citing '207 Patent at 16:56–58, 17:35–37).)

The crux of the invention disclosed in the Patents is directed toward a system of independent poles. This is supported in the patent examiner's Notice of Allowance. (Doc. No. 155, Ex. A.) The '207 Patent references the use of independent poles multiple times. *See generally* '207 Patent at 16:57, 17:21, 17:36. Defendants fail to identify a single disclosed embodiment employing non-independent poles. Instead, the '207 Patent explicitly teaches away from prior art using a "rigid" framework to support the enclosure fencing. '207 Patent at 1:41–59, 9:52–56. The Court finds the use of "plurality of posts" and "plural support members" in the '207 Patent to be synonymous with the use of "plural independent poles." Accordingly, the Court construes the terms "plurality of posts" and "plural support members" to mean, **"More than one structurally supportive pole that is elongated (or pieces of the same that connect together to form one pole) wherein each pole is not connected to another pole above the surface of the mat in a substantively inflexible manner."**

     **B. "flexible top line" / "flexible bottom line" / "flexible loop" ('845 Patent, Claims 2, 3; '207 Patent, Claims 9, 12, 17, 27)**

| Plaintiff's Proposal | Defendants' Proposal |
| --- | --- |
| "Flexible material added to or existing along the netting /enclosure to add strength and/or support. The top/bottom line can be integral to, woven from, woven into, or later added to the netting/enclosure." | "Flexible material, (such as woven netting, strong fabric, plastic webbing, or the like) added to or existing along the netting to add strength and/or support. The top/bottom line can be integral to, woven from, woven into, or later added to the netting." |

The primary dispute between the Parties is whether to include specific examples of "flexible material." Defendants argue the Court should include the language "such as woven netting, strong fabric, plastic webbing, or the like" in its construction. (Doc. No. 146, at 14–16 (citing '845 Patent at 5:40–41).) Defendants specifically seek to exclude certain alternative materials, namely "PVC, aluminum, fiberglass." (Doc. No. 146, at 15–16.) Plaintiff argues that Defendants are trying to limit Plaintiff to particular embodiments. (Doc. No. 138, at 7–8.) Defendants argue a limitation is necessary as "any type of material, including strips of steel that, when made into a sufficient length and width" could be argued to be flexible. (Doc. No. 146, at 15–16.) Plaintiff argues that under proper conditions, materials like "PVC, aluminum, and fiberglass" could be considered flexible without excessive force, and thus should be considered within the scope of the patent.[4] (Doc. No. 155, at 5.)

As Plaintiff correctly demonstrates, it is possible for the same material to be considered flexible in certain circumstances, but inflexible in other instances. Generally speaking, flexibility is a physical characteristic of a material, not necessarily something that is limited to a particular list of materials. Defendants seek to provide reference to materials specifically named in the Patent as examples. Nothing in the Patents suggest this list of materials is exhaustive.[5] Rather, it appears that the materials listed are only specified embodiments. The important limitation of the claim is that the material exhibit flexible characteristics (i.e. "allow[] the tops of the poles to move relative to one another, but the tops of two adjacent poles can not move away from each other to any great extent." '845 Patent at 6:4–7.), not that the material be from a particular list. The Court declines to limit the construction to the preferred embodiments included in the

---

[4] Specifically, Plaintiff cites to a PVC jump rope as an example of flexible PVC. (Doc. No. 155, Ex. B.)
[5] In fact, it appears Defendants recognize this as well by including "or the like" in their proposed construction.

specification. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

Plaintiff also seeks to add the word "enclosure" to the claim construction as an alternative to the word "netting." "Netting" is a particular type of preferred material for the enclosure wall disclosed in the specification. *See* '845 Patent at 5:55–60 ("The most preferred fabric for the wall 100 is an extruded monofilament polypropylene netting in which the nodes and strands are rounded/oval, with smooth transitions in order to reduce the chance of cuts/abrasions to the users (and to structures to which the fabric is secured)"), 19:46 (identifying element 100 as depicting "fence netting"), 21:24–27 ("The trampoline of claim 1 wherein the flexible material is fence netting . . . ."). The "netting" is used to refer to the material of element 100 of the Patents. '845 Patent at 19:46. The term "wall" is consistently used to describe element 100 and used to describe the element that the top and bottom line attach to. '845 Patent at 5:32–43 ("A generally cylindrical wall 100 of a flexible material is suspended between the posts 44 to define a chamber 106 above the rebounding surface 40. . . . The wall 100 has top and bottom edges 101, 102 and is made of a light-weight plastic sheet material, such as extruded plastic safety fencing, having a unitary structure with numerous mesh-like openings 104."), 6:38–56 ("The wall 100 is secured to the upper line 108 along portions thereof extending between the posts 44. . . . A similar arrangement is used to secure the bottom edge 102 of the wall 100."). While "netting" may be a preferred embodiment of material for the wall, nothing in the Patents suggest that the wall is limited to only netting material. The term "enclosure" alone is much broader and may refer to the entire enclosure system (element 30), which includes the posts. '845 Patent at 3:29–34. Thus, the Court finds that the specification uses the phrase "wall" to describe the element that the top or bottom line attaches to.

Accordingly, the Court construes the terms "flexible top line," "flexible bottom line," and "flexible loop" to mean, **"Flexible material added to or existing along the enclosure wall to add strength and/or support. The top/bottom line can be integral to, woven from, woven into, or later added to the enclosure wall."**

C. **"bracket defining at least one opening to receive the top line" ('845 Patent, Claim 2)**

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary. | "Each bracket has an accessible portion into or through which the top line can be placed." |

The Parties dispute whether the claim should be limited to require that the top line be placed into or through an accessible portion of a bracket. Plaintiff argues the specification teaches there are "many alternative methods for securing the top line 108 to the posts 44" and specifically indicates "[o]ne is to wrap the line 108 once completely around the next 90 of the end cap 86, so as to slidably engage the line with the post without use of a ring 114." (Doc. No. 138, at 8–9 (citing '845 Patent at 11:39–43).) Defendants argue that principles of issue preclusion require this Court to adopt the same claim construction that was previously construed for the same term in prior litigation.[6] (Doc. No. 146, at 17.)

With respect to this term, the Court need not address the merits of Defendants' issue preclusion argument, as the Court finds that Defendants' construction is supported by the intrinsic record. While the specification discloses "many alternative methods for securing the top line," the Patents only use the term "bracket" to describe one particular method. Namely, "a

---

[6] *JumpSport, Inc. v. Jumpking, Inc., et al.*, No. 4:01-cv-04986-PJH (N.D. Cal. Dec. 19, 2001). The Walmart and Sam's Club entities were parties to the *Jumpking* action; however, the other Defendants were not parties.

bracket can fit, or be bolted, onto the top of a pole and define one or more slits through which the strap can be passed. Various cam arrangements can be used to permit the strap to slide through a slitted fixture on the top of each post, until a cammed lever is pressed down, locking the strap in place."[7] '845 Patent at 13:14–19. Plaintiff seeks to broaden the scope of the claim by bringing in additional methods of securing the top line disclosed in the specification. Nevertheless, the method of "wrap[ing] the line . . . once completely around the . . . end cap" would not allow any bracket to *receive* the top line. Instead, it appears that only one embodiment disclosed in the specification describes a "bracket." '845 Patent at 13:14–19. The claim language is consistent with the patentee attempting to claim this embodiment. Defendants' construction is thus consistent with the intrinsic record of the Patents. Accordingly, the Court construes the term, "bracket defining at least one opening to receive the top line" to mean, **"Each bracket has an accessible portion into or through which the top line can be placed."**

### D. "coupled to said independent poles and to the rebounding mat" ('845 Patent, Claim 1)

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| "Connected to the independent poles and to the rebounding mat." | "Connected to the independent poles and to the rebounding mat, either directly or through a discrete coupling device that is not an element of the trampoline or enclosure." |

The Parties dispute whether a "discrete coupling device that is not an element of the trampoline or enclosure" is required when the safety enclosure is indirectly connected to the independent poles and rebounding mat. For instance, the Parties dispute whether connecting the safety enclosure to the trampoline springs satisfies this claim limitation. Plaintiff argues the

---

[7] Earlier in the same paragraph, "top strap" is identified as element 108, suggesting similar scope as the phrase "top line." '845 Patent at 13:6.

specification discloses an embodiment attaching the safety enclosure to the springs which would be excluded by Defendants' proposed construction. (Doc. No 138, at 11–12 (citing '845 Patent at 7:23–34, 43–47).) Defendants' primary argument is based upon issue preclusion from the prior *Jumpking* litigation. (Doc. No 146, at 18–20.) Defendants urge the Court to adopt the identical construction as the *Jumpking* court.

The doctrine of issue preclusion, also known as collateral estoppel, "bars relitigation of an issue of fact or law raised and necessarily resolved by a prior judgment." *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358, 196 L. Ed. 2d 242 (2016); *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5, 99 S. Ct. 645, 649, 58 L. Ed. 2d 552 (1979). Issue preclusion, "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co.*, 439 U.S. at 326 (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329, 91 S. Ct. 1434, 1442–1443, 28 L. Ed. 2d 788); *Montana*, 440 U.S. at 153. Issue preclusion is intended to promote fairness and certainty, while preventing the wasteful expenditure of resources upon issues already resolved through adversarial proceedings. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980); *Montana*, 440 U.S. at 153–54.

In patent cases, issue preclusion is analyzed under the law of the regional circuit. *United Access Techs., LLC v. Centurytel Broadband Servs. LLC*, 778 F.3d 1327, 1330 n.1 (Fed. Cir. 2015) (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1311 (Fed. Cir. 2010); *Bayer AG. v. Biovail Corp*., 279 F.3d 1340, 1345 (Fed. Cir. 2002)). Under Fifth Circuit law, issue preclusion precludes a party from litigating an issue

already raised in an earlier action only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005).

In the specific context of patent claim construction, the Court recognizes that one of the reasons provided by the Supreme Court in *Markman* was to promote uniformity and decrease uncertainty. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91, 116 S. Ct. 1384, 1396, 134 L. Ed. 2d 577 (1996). The Supreme Court has further recognized that cases construing the same claim of a patent will "sometimes be binding because of issue preclusion . . . and sometimes will serve as persuasive authority." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839–40 (2015) (citing *Markman*, 517 U.S. at 391). When a plaintiff litigates construction of the same patents in a prior case, issue preclusion may potentially be invoked against a plaintiff to estopp a plaintiff from relitigating construction of the same terms. *Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 585–86 (E.D. Tex. 2002); *Allergan Sales, LLC v. Sandoz Inc.*, No. 2:12-CV-207-JRG, 2016 WL 1224868, at *5 (E.D. Tex. Mar. 29, 2016); *but see Maurice Mitchell Innovations, L.P. v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *3 (E.D. Tex. June 21, 2006), *aff'd*, 249 F. App'x 184 (Fed. Cir. 2007).

The application of issue preclusion, however, is not without limitations. Issue preclusion is an equitable doctrine premised on principles of fairness. *Nations v. Sun Oil Co. (Delaware)*, 705 F.2d 742, 744–45 (5th Cir. 1983) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331, 99 S. Ct. 645, 651, 58 L. Ed. 2d 552 (1979)); *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1423 (5th Cir. 1995); *United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983); *In re*

*Freeman*, 30 F.3d 1459, 1467 (Fed. Cir. 1994) (citing *Blonder–Tongue*, 402 U.S. at 349). A court holds discretion in determining whether the exercise of preclusion is appropriate.[8] *Id.* A court should decline to apply issue preclusion if applying preclusion would work to create an injustice. *Moch v. E. Baton Rouge Par. Sch. Bd.*, 548 F.2d 594, 597 (5th Cir. 1977) ("[C]ourts have occasionally rejected strict application of bar and estoppel principles when their use would violate an overriding public policy or result in manifest injustice."); *see also* Restatement (Second) of Judgments § 28 (1982); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4426 (3d ed. Apr. 2018 Update).

In the *Jumpking* case, the parties to that action sought construction of the term "coupled to said independent poles and to the rebounding mat." The primary dispute raised before the *Jumpking* court was whether the claim required the safety enclosure to be directly attached to the independent poles and rebounding mat or whether indirect connection was covered by the scope of the claim. *JumpSport, Inc. v. Jumpking, Inc., et al.*, No. 4:01-cv-04986-PJH, Doc. No. 239, at 11 (N.D. Cal. Apr. 01, 2003) [hereinafter *Jumpking* Claim Construction Order]. In its initial claim construction briefing, JumpSport urged the court to adopt the construction, "connected to the independent poles and to the rebounding mat," the same construction Plaintiff urges the Court to adopt in the instant case. *JumpSport, Inc. v. Jumpking, Inc., et al.*, No. 4:01-cv-04986-PJH, Doc. No. 211, at 14–15 (N.D. Cal. Jan. 31, 2003). In its initial claim construction order, the *Jumpking* court adopted JumpSport's proposed construction. *Jumpking* Claim Construction Order at 11. Subsequently, on summary judgment to support their argument for invalidity, the

---

[8] Unlike the doctrine of claim preclusion, or *res judicata*, issue preclusion is not a matter of legal right. Rather, it is an equitable doctrine to be applied "only when the alignment of the parties and the legal and factual issues raised warrant it." *Nations v. Sun Oil Co. (Delaware)*, 705 F.2d 742, 744 (5th Cir. 1983). As a principle of equity, "fairness to both parties must be considered when it is applied." *Id.* (citing *Johnson v. United States*, 576 F.2d 606, 614 (5th Cir. 1978), *cert. denied*, 451 U.S. 1018, 101 S. Ct. 3007, 69 L. Ed. 2d 389 (1981)).

*Jumpking* defendants argued that "any component of the safety enclosure connected to any element that ultimately connects to the rebounding mat may be considered 'indirectly' connected to the rebounding mat and thus covered by the patent." *JumpSport, Inc. v. Jumpking, Inc., et al.*, No. 4:01-cv-04986-PJH, Doc. No. 322, at 11 n.12 (N.D. Cal. Jun. 02, 2003) [hereinafter *Jumpking* Summary Judgment Order]. The *Jumpking* court rejected this argument as "overbroad." *Id.* Thus, on its own initiative, the *Jumpking* court sought to clarify its prior construction and adopted the construction, "connected to the independent poles and to the rebounding mat, either directly or through a discrete coupling device that is not an element of the trampoline or enclosure." *Id.* The *Jumpking* case proceeded to a jury verdict where the jury applied the court's claim construction to find claim 1 of the '845 Patent valid and some, but not all, of the *Jumpking* defendants' products to infringe the claim. *JumpSport, Inc. v. Jumpking, Inc., et al.*, No. 4:01-cv-04986-PJH, Doc. No. 565 (N.D. Cal. Dec. 05, 2003) [hereinafter *Jumpking* Jury Verdict].

Defendants in the instant case argue that because the *Jumpking* court construed the same term at issue and the case proceeded to a jury verdict requiring the application of the court's claim construction, all three elements required for issue preclusion are therefore satisfied. (Doc. No. 146, at 6–11, 18–19.) Plaintiff argues in response that the issue before the *Jumpking* court was not identical because the court applied a different legal standard for claim construction than the current state of the law—namely the *Texas Digital*[9] standard. (Doc. No. 155, at 6–7.) At the claim construction hearing, Plaintiff also noted that the current issue raised in claim construction was never actually litigated before the *Jumpking* court.

---

[9] *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002). Plaintiff argues that the Federal Circuit has since "condemned" the *Texas Digital* standard use of extrinsic evidence through the decision in *Phillips v. AWF Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

Determination of whether an identical issue was litigated in an earlier action is often the most challenging determination of an issue preclusion analysis. Restatement (Second) of Judgments § 27 cmt. c (1982). The inquiry forces a court to balance two competing interests—"a desire not to deprive a litigant of an adequate day in court . . . [and] a desire to prevent repetitious litigation of what is essentially the same dispute." *Id.* For an issue to be identical, it must be based on the same facts and legal standard. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005); *In re Southmark Corp.*, 163 F.3d 925, 932 (5th Cir. 1999); *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290–91 (5th Cir.1995). Claim construction is a question of law often premised on the resolution of subsidiary factual disputes. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 838 (2015).

As Defendants correctly note, "[a] claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis in original). Defendants argue that because the Patents and prosecution history are unaltered that the same claim construction issue is now before this Court. (Doc. No. 146, at 7–8.) Defendants' position, however, is removed from the practical realities that surround patent litigation. While courts are tasked with resolving claim construction without consideration of the accused devices, it is naturally the accused devices that fuel disputes over the scope of patent claims and focus the arguments presented by the parties. In claim construction, the parties are often more interested in litigating whether the scope of a patent claim "covers" or does not "cover" an accused device than arriving at a pure abstract legal determination of claim construction. As a result, certain aspects of claim scope may never be disputed or considered by

a court in a prior action. While this Court is mindful of the claim construction principles of increased "uniformity" and decreased uncertainty articulated by the Supreme Court in *Markman*[10], binding parties to a prior court's claim construction when a disputed aspect of claim scope was never litigated before the prior court deprives the litigant of an adequate opportunity to be fully heard on the issue.

When the underlying dispute relating to the scope of a claim in a prior action is different than the instant action, issue preclusion may not be appropriate. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1324 (Fed. Cir. 1987) ("*To the extent that the underlying facts are based on identical premises*, as is here the case, the prior findings and the claim construction based thereon are the law of the case." (emphasis added)); *Guardian Media Techs., Ltd. v. Acer Am. Corp.*, No. 6:10-CV-597, 2013 WL 1866901, at *10 (E.D. Tex. May 2, 2013) (declining to apply issue preclusion when the scope dispute between the parties was different in the prior litigation). In the *Jumpking* case, the primary dispute focused on whether the claim required the safety enclosure to be directly attached to the independent poles and rebounding mat or whether indirect connection was covered by the scope of the claim. *Jumpking* Claim Construction Order at 11. The issue of whether attaching the safety enclosure to the springs is within the scope of the claim does not appear to have ever been resolved by the *Jumpking* court. *Id.* Accordingly, this Court finds that the *Jumpking* court never resolved the issues presented in the instant claim scope dispute now before this Court.

Additionally, the procedural posture of the development of the claim construction in the *Jumpking* action raises questions regarding whether the issue was actually litigated. When considering whether an issue is actually litigated, "the inquiry must always be as to the point or

---

[10] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91, 116 S. Ct. 1384, 1396, 134 L. Ed. 2d 577 (1996).

question actually litigated and determined in the original action; not what might have been thus litigated and determined." *United States v. Int'l Bldg. Co.*, 345 U.S. 502, 505, 73 S. Ct. 807, 809, 97 L. Ed. 1182 (1953) (quoting *Cromwell v. Sac Cty.*, 94 U.S. 351, 352–53, 24 L. Ed. 195 (1876)). "As a general rule, an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, and actually determined." *Matter of Gober*, 100 F.3d 1195, 1203 (5th Cir. 1996); *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 430 F.2d 38, 45 (5th Cir. 1970); Restatement (Second) of Judgments § 27 cmt. d (1982). In *Jumpking*, the court originally adopted a claim construction in its claim construction order. *Jumpking* Claim Construction Order at 11. Subsequently, on its own initiative and without additional briefing or argument on claim construction, the court amended its claim construction when ruling on summary judgment. *Jumpking* Summary Judgment Order at 11 n.12. While briefing and argument was held on the court's original claim construction, it is unclear whether the issue of the *Jumpking* court's amended claim construction was actually litigated before the court. An order relating to claim construction issued in the context of summary judgment without any argument or briefing on the claim construction issue in some cases may not be considered actually litigated as it relates to the claim construction issue. *RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1262 (Fed. Cir. 2003); *Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1347 (Fed. Cir. 2002). As JumpSport did not have an opportunity to be fully heard on the amended claim construction, it does not appear that the issue of whether attaching the safety enclosure to the springs is within the scope of the claim actually litigated before the *Jumpking* court.

Furthermore, the specific issue disputed between the Parties (i.e. whether attaching the safety enclosure to the springs is within the scope of the claim) was not necessary to the prior

judgment in the *Jumpking* action. An issue will not be precluded if the issue was only incidental, collateral, or immaterial to the prior judgment. *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981); *Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed. Cir. 1983). "[J]udicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity or infringement; further . . . such statements should be narrowly construed." *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042, 104 S. Ct. 707, 79 L. Ed. 2d 171 (1984). Furthermore, the patent owner must have lost on the issue of validity or infringement and the construction of the claim must have been the reason for loss on that issue. *Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1578 (Fed. Cir. 1984). If a claim is held "valid and infringed on a narrower than necessary basis" issue preclusion does not apply, as the patent owner cannot appeal. *Id.* In *Jumpking*, the jury applied the court's claim construction to find claim 1 of the '845 Patent valid and some, but not all, of the *Jumpking* defendants' products to infringe the claim. *Jumpking* Jury Verdict. The record on appeal suggests that the likely reason for JumpSport's loss on infringement had nothing to do with whether attaching the safety enclosure to the springs is within the scope of the claim. Instead, the Federal Circuit held, "[b]ecause Jumpking presented evidence at trial that the poles in the FunRing–2 product are connected to each other in an 'inflexible manner,' substantial evidence supports the jury's conclusion that FunRing–2 does not infringe the '845 and '207 patents." *JumpSport, Inc. v. Jumpking, Inc.*, 191 F. App'x 926, 932 (Fed. Cir. 2006). Thus, the record suggests that the issue of whether attaching the safety enclosure to the springs is within the scope of the claim was only incidental, collateral, or immaterial to the prior judgment in *Jumpking*.

Finally, the Court must consider the fairness of the application of issue preclusion to both Parties under principles of equity. *Nations v. Sun Oil Co. (Delaware)*, 705 F.2d 742, 744 (5th Cir. 1983). Issue preclusion is intended as a defense to protect litigants from unnecessarily relitigating issues that have already been decided by a court. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 649, 58 L. Ed. 2d 552 (1979) (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329, 91 S. Ct. 1434, 1442–1443, 28 L. Ed. 2d 788); *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210 (1979). As discussed, *supra*, the current disputed scope of the claim was not material in the *Jumpking* action. At the time of the *Jumpking* litigation, 15 years ago, the parties to the *Jumpking* action did not foresee that the question of whether attaching the safety enclosure to the springs is within the scope of the claim would be of importance in possible future litigation. Thus, the parties in *Jumpking* did not fully litigate this issue as extensively as they would have if they foresaw the potential preclusive effect or application in future litigation. Applying issue preclusion when it was unforeseeable that a fact or issue would be of importance in possible future litigation is unfair. *Hyman v. Regenstein*, 258 F.2d 502, 511 (5th Cir. 1958); *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 462–63 (5th Cir. 1971) (citing *The Evergreens v. Nunan*, 141 F.2d 927 (2d Cir. 1944)); *see also* Restatement (Second) of Judgments § 28(5) (1982). A mechanical application of issue preclusion in the instant case would neither promote the underlying goals of issue preclusion (i.e. judicial economy and avoiding wasteful, unnecessary litigation), nor be consistent with principles of fairness and equity.

The Court finds that Defendants have failed to satisfy the three requirements for issue preclusion. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005). Moreover, even if Defendants had

satisfied the three prerequisites to apply issue preclusion, principles of fairness and equity weigh against its application. *Nations v. Sun Oil Co. (Delaware)*, 705 F.2d 742, 744 (5th Cir. 1983). Thus, the Court declines to apply issue preclusion in the instant case. Accordingly, the Court must turn to the record to construe the scope of the claim.

The Patents discuss multiple methods of securing the safety enclosure. '845 Patent at 7:20–50. Among these methods is "weaving the webbing 120 through the eyes or loops 123 along the margin of the rebounding surface (to which the springs 39 attach), or the inner ends of springs." '845 Patent at 7:26–29. Alternatively, the webbing may be attached to an "annualar pad 39 that is commonly used to cover the springs" or through "cable ties, elastic cording, or other webbing." '845 Patent at 7:35–43. "In still other arrangements, no discrete coupling member is employed, but the fencing is directly coupled to an element of the trampoline (e.g. springs 39 can be passed through openings 104 near the bottom margin of the fence.)" '845 Patent at 7:43–47.

The specification of the Patents explicitly discloses methods of indirectly connecting the safety enclosure to the rebounding mat through another element of the trampoline—namely the springs. '845 Patent at 7:43–47. This suggests that Plaintiff's proposed construction accurately reflects the scope of the claim intended by the patentee, whereas Defendants' proposed construction seeks to exclude embodiments explicitly disclosed in the specification.

Accordingly, the Court construes the term, "coupled to said independent poles and to the rebounding mat" to mean, **"Connected to the independent poles and to the rebounding mat."**

### E. "secured to the wall support portions of the posts and to the top line" / "wall support portion" ('207 Patent, Claims 1, 12)

| Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"secured to the wall support portions of the posts and to the top line"** | "Connected to the posts and/or the end caps, if any, at a position above the | Plain and ordinary meaning. |

| | trampoline bed, and to the top line." | |
|---|---|---|
| **"wall support portion"** | No construction necessary apart from the preceding term ("secured to the wall support portions of the posts and to the top line"). | "Location on the pole above the surface of the rebounding mat, but below the upper end portion of the pole." |

The Parties' dispute rests primarily on two issues: (1) whether the "wall support portion" and "upper end portion" of the posts are distinct sections or whether they may overlap; and (2) whether attachment of the wall material to solely the top of the post or end cap satisfies the claim limitations.

Plaintiff argues that "wall support portion" and "upper end portion" are merely locations on the post, not separable sections. (Doc. No. 138, at 13 (citing '845 Patent at 3:39–40).) Notably, Plaintiff points to Figure 5 which shows the webbing wrapped in a helical pattern around the entire length of the pole above the rebounding surface, both above and below the location designating the elements for "wall support portion" and "upper end portion." Plaintiff further argues that the specification teaches that in some embodiments the webbing/wall is only attached at the tops of the posts. (Doc. No. 138, at 13 (citing '845 Patent at 7:29–31).)

Defendants argue that Figure 5 and common sense dictate that distinct elements should be understood as separate and not overlapping. (Doc. No. 146, at 17–19.) Defendants also argue that the "not separable sections" language cited by Plaintiff refers to not requiring the post be made up of multiple attached poles. Further, Defendants argue that the embodiment cited by Plaintiff referencing the attachment of the wall/webbing only at the tops references an alternative embodiment outside the scope of the claim. (Doc. No. 146, at 18–19.)

The wall support portion is identified as element 48 throughout the patent. "[E]ach post 44 is referred to as having an upper end portion 46, a wall supported portion 48 located above the

level of the rebounding surface 40, a lower portion 50 located below the surface 40, and a lower end portion 52 which extends to ground level." '845 Patent at 3:34–39. Figure 5 of the Patents is indicated to depict a helical wrap of webbing extending from the frame to the top end cap. '845 Patent at 7:57–8:3. Figure 5 depicts the helical wrap attached along the length of the post including both above and below the elements designated as "wall support portion" and "upper end portion." '845 Patent at Fig. 5. The specification also notes, "[i]n some embodiments, the netting is not [to] be affixed to the support posts 44 except at their tops." '845 Patent at 7:29–31.

Both "wall support portion" and "upper end portion" are best understood merely as location points, rather than ranges along the post. Figure 5 depicts webbing extending along the entirety of the post located above the rebounding surface. '845 Patent at Fig. 5. "Wall support portion" is best understood as indicating the portion of the post that supports the wall. Defendants' proposed construction only introduces greater ambiguity by requiring one to inquire where does the "wall support portion" end and where does the "upper end portion" begin. The intrinsic record suggests nothing preventing the two regions from overlapping. The Patents also disclose an embodiment wherein the webbing/wall is only attached to the post at the tops (i.e. end caps). '845 Patent at 7:29–31. Thus, Plaintiff's argument that the end caps should be considered part of the wall support portion is supported by the embodiments disclosed in the specification.

Plaintiff's proposed construction, however, seeks to introduce a new term—"trampoline bed." The term more consistently used throughout the specification to describe the location of the wall support portion is "rebounding surface." '845 Patent at 3:36–37. Thus, the Court finds

use of the phrase "rebounding surface" in the claim construction is more consistent with the intrinsic record.[11]

Accordingly, the Court construes the term, "secured to the wall support portions of the posts and to the top line" to mean, **"Connected to the posts and/or the end caps, if any, at a position above the rebounding surface, and to the top line."** The Court further finds that construction of the term, "secured to the wall support portions of the posts and to the top line" resolves any dispute between the Parties regarding the scope of the term "wall support portion." Accordingly, the Court declines to construe the term "wall support portion" alone.

F. **"wherein the coupling of the safety enclosure to both the independent poles and to the rebounding mat helps in absorption of impact forces to the safety enclosure" ('845 Patent, Claim 1)**

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| "By being connected to both the independent poles and the rebounding mat, the safety enclosure utilizes the impact absorption properties of both the enclosure and rebounding mat to absorb the forces of an impact to the enclosure." | Plain and ordinary meaning. |

Plaintiff contends additional clarification of the claim language is necessary to make clear that the invention is not directed toward "rigid, non-absorptive couplings of the enclosure to the poles and mat." (Doc. No. 138, at 17.) Plaintiff bases its argument entirely off of an extrinsic deposition transcript. Defendants submit the plain and ordinary meaning is sufficiently descriptive. (Doc. No. 146, at 23–24.)

---

[11] At the claim construction hearing, the Court proposed a construction amending "trampoline bed" to "rebounding surface" and Plaintiff's counsel indicated support for the amendment.

The specification discusses generally how the flexible posts and rebounding surface help absorb impacts upon the wall. '845 Patent at 9:30–51. Consistent with the claims, the specification uses the term "help" to describe the relationship of the absorption properties of the independent poles and rebounding mat. '845 Patent at 9:30–35. While Plaintiff's construction appears to be generally accurate, it does not appear to be necessary or aid the jury in understanding the patent, or clearly resolve any dispute between the Parties regarding the scope of the claim. "[C]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). It is not "an obligatory exercise in redundancy." *Id.* The Court recognizes that if the claim term had multiple ordinary meanings or if the scope of the claim was disputed among the Parties, then the Court may be obligated to construe the claim term's meaning. This, however, is not the situation in the instant case. The "help" language in the original claim appears to sufficiently describe the fact that the impact absorption properties of the rebounding mat helps in the absorption of impact to the enclosure. Moreover, it remains unclear to the Court what, if anything, regarding the scope of this claim language is disputed among the Parties. Here, the plain and ordinary meaning of the claim appears sufficient. Accordingly, the Court declines to construe the term "wherein the coupling of the safety enclosure to both the independent poles and to the rebounding mat helps in absorption of impact forces to the safety enclosure."

## CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above**.**

**So ORDERED and SIGNED this 28th day of August, 2018.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE